**CASSANDRA L. LOPEZ**
California State Bar No. 260919
**FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
San Diego, California 92101-5030
Telephone: (619) 234-8467
Facsimile: (619) 687-2666
Cassandra_L_Lopez@fd.org

Attorneys for Ramiro Ponce-Galvan

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO.: 21-CR-2227-H |
| Plaintiff, | Hon. Marilyn L. Huff |
| v. | **MR. PONCE-GALVAN'S SENTENCING MEMORANDUM** |
| RAMIRO PONCE-GALVAN | |
| Defendant. | |

TO: RANDY GROSSMAN, UNITED STATES ATTORNEY;
AMY WANG, ASSISTANT UNITED STATES ATTORNEY;
STEPHEN WONG, ASSISTANT UNITED STATES ATTORNEY;
ADRIENNE SCOTT, UNITED STATES PROBATION:

**I.**

**INTRODUCTION**

Ramiro Ponce-Galvan respectfully requests a sentence of 30 months' custody with no supervised release to follow. While the requested sentence is significantly below the guidelines and substantially less than the sentence imposed in 2016 for his prior §1326 offense, there is good cause to impose the requested sentence. Most notably, Mr. Ponce-Galvan attempted to return to the United States after his brother had been shot and killed in Mexico and after Mr. Ponce-Galvan himself received threats in Tijuana.

## II.

## **THE REQUESTED SENTENCE IS APPROPRIATE UNDER 3553(a)**

### A. **Mr. Ponce-Galvan was born in Michoacan where his family has been the victim of violence numerous times over the past twenty-five years**

Mr. Ponce-Galvan is 38 years old. He was born in Michoacan, Mexico in 1984 where his father, Virgilio Ponce, owned a cattle ranch. When Mr. Ponce-Galvan was five years old, his father was shot and killed by unknown assailants. Then, in 1997, Mr. Ponce-Galvan's older brother, Virgilio Ponce-Galvan, was also shot and killed by unknown assailants. Virgilio was just 15 years old at the time. Fearful that Mr. Ponce-Galvan would also be targeted, his mother sent him to the United States to live with her mother and brother in Orosi, California.

Mr. Ponce-Galvan left home in 1997 shortly after Virgilio's death. He was just 12 years old. Although he was still just a child and not ready to leave home, his mother had explained that he was not safe in Michoacan and that she feared that he might be harmed or killed if he remained in Mexico. Mr. Ponce-Galvan was happy that he had family in the United States who could take him in, but living with his grandmother and uncle was not the same as living with his own mother. He missed his mother's love and affection.

His mother eventually moved to the United States when Mr. Ponce-Galvan was 16 or 17, as did his two younger sisters and a younger brother. His sisters, Madeira, and Maria, both currently live in the Central Valley and they both have legal status in the United States.

### B. **Upon arriving in the United States, Mr. Ponce-Galvan began working in the fields at age 12**

Mr. Ponce-Galvan attended school through the 4th grade in Mexico. During his years in elementary school, he learned rudimentary reading and writing skills. When he arrived in the United States, rather than continue with his education as most children

his age were doing, Mr. Ponce-Galvan began working in the fields of California's Central Valley. Mr. Ponce-Galvan's family needed him to work, rather than attend school, so that he could help his family make ends meet. He picked grapes, nectarines, cherries, and peaches, working from 6 am to 4 pm five or six days a week for $6.50 per hour. There is a loophole in U.S. child labor laws that allows children to start working in the fields as young as age 10.

According to a report from American Public Media, farm work is one of the riskiest jobs in the United States.[1] Farmworkers are exposed to pesticides, extreme weather, extreme temperatures, and dangerous equipment. According to American Public Media, "It's deadlier than being a firefighter, a mine machinery operator or a police officer." Despite the risks associated with this work, "harvesting crops is one of the nation's lowest-paying jobs." *Id.* Mr. Ponce-Galvan toiled in the fields from age 12 to about age 19 or 20.

### C. Limited opportunities, and his struggle with drug addiction resulted in criminal convictions and deportation to Mexico

Sadly, Mr. Ponce-Galvan became exposed to methamphetamine at a young age. It's not surprising, given the long hours he worked in the fields, and lack of parental supervision or guidance, that he quickly became addicted to the drug. When he was still just a teenager, he began to have run ins with the law, largely due to his own drug addiction. This culminated with him serving a lengthy prison sentence in 2009 after he was convicted of assault with a firearm and then later of §1326, for which he received a sentence of 63 months.[2]

---

[1] *The Children in the Fields,* APM reports August 14, 2019, available at: https://www.apmreports.org/episode/2019/08/14/the-children-in-the-fields.

[2] Mr. Ponce-Galvan's sentencing range under the Guidelines when he was sentenced in 2016 was 63-78 months. *See* 16-CR-382-JLS Dkt. No. 18 (PSR). The government recommended -2 for fast track and imposed the +16 enhancement for a prior aggravated felony conviction. In 2016, the same year that Mr. Ponce-Galvan was sentenced, the 2L1.2 sentencing guidelines were amended and the +16 enhancement was substituted for a less harsh sentencing scheme. Had Mr. Ponce-Galvan previously been sentenced under the current Guidelines, his sentencing range in 2016 would have been 33-41 months (8 +10 (prior felony with a sentence greater than 5 years), -3 (acceptance) -2 (fast

Mr. Ponce-Galvan was deported in 2020, after serving a 63-month sentence for §1326. He had not spent any significant period of time in Mexico since he first came to the United States at age 12. But after serving such a lengthy prison sentence for illegal reentry, he realized the severe consequences he faced if he returned to the United States. He was determined to begin a new life for himself in Mexico. But, as described below, he began to fear for his safety and even his life after his brother was murdered in Mexico and Mr. Ponce-Galvan himself received threats.

Going forward, Mr. Ponce-Galvan hopes to present his application for withholding of removal or protection under the Convention Against Torture to the immigration court. In addition, his family has remained supportive of him over the years. His sister Maria Ponce, who testified at his trial, visited him in Mexico and has provided financial and emotional support to Mr. Ponce-Galvan. He will count on her support going forward, whether it be to gather evidence in support of his immigration claim, or help finding a safe place to live in Mexico.

## II.

### The Requested Sentence is Fair and Will Result in Just Punishment

*In the history of the world, it might even be that there was more punishment than crime –* Cormac McCarthy, *The Road*

### A. Imperfect Duress

The Court should depart downward four levels based on imperfect duress under §5K2.12 which provides that "if the defendant committed the offense because of serious coercion, blackmail or duress, under circumstances not amounting to a complete defense, the court may depart downward." As described above, Mr. Ponce-Galvan's father and brother were murdered in Michoacan, Mexico in 1987 and 1997

---

track)).

respectively. After his brother, Virgilio, died in 1997, his mother sent Mr. Ponce-Galvan to live with his uncle and grandmother in Orosi, California.

In 2019, Mr. Ponce-Galvan's younger brother, Jose Ivan Estrada Ponce, was deported from the United States to Mexico. Jose Ivan returned to Michoacan. But he was tragically shot and killed in Michoacan on June 24, 2020 less than 9 months after his deportation and about 6 weeks before Mr. Ponce-Galvan was deported to Mexico on August 10, 2020.[3] Ex. A, B. The murder occurred on the "Carretera Tacambaro-Puruaran, Chupio Tacambaro." It appears that there was a police investigation and some local news coverage of his murder.[4] Ex. C. However, the family never found out who had killed Jose Ivan or why.

Mr. Ponce-Galvan was first deported to Mexico in 2003 and has been removed on several occasions. He typically returned to the United States shortly after his removal. However, in 2020, he was deported after having served a sentence of 63 months in custody on a §1326 offense. Aware that he was facing severe consequences should he return to the United States without permission, he resolved to remake a life for himself in Mexico. He decided to settle in Tijuana, rather than return to the area where he was born, because of the violence his family had experienced in Michoacan. He was particularly concerned because Jose Ivan had been murdered in Michoacan, less than two months before Mr. Ponce-Galvan was deported. Nonetheless, he believed he would be safe in Tijuana, far from central Mexico. He found work in the construction industry, met a girlfriend named Joanna that he was serious about, and was happy. His sister Maria Ponce visited him when she could and Mr. Ponce-Galvan began to envision a future for himself in Mexico.

---

[3] Exhibit A is a crime scene photo provided to counsel by Mr. Ponce-Galvan's family. Had she been permitted to do so, Maria Ponce would have testified at trial that she recognized her brother, Jose Ivan Ponce Estrada, as one of the deceased individuals in this photo and that she showed this photo to Mr. Ponce-Galvan on one of her visits to see him in Mexico.

[4] *See* attached articles describing a double homicide in the Chupio section of the municipality of Tacambaro.

Unfortunately, on March 11, 2021, Mr. Ponce-Galvan was threatened in Mexico. He had gone to an OXXO convenience store in his neighborhood where a young man approached him and, in a threatening voice, told Mr. Ponce-Galvan, "you better get out of here. We don't want you here." Mr. Ponce-Galvan didn't know who this man was or why he had threatened him, but he didn't want trouble, so he relocated to another neighborhood in Tijuana and started living with his girlfriend, Joanna.

Mr. Ponce-Galvan relayed to his family that he had been threatened and they began to grow increasingly concerned about Mr. Ponce-Galvan's safety in Mexico, especially given what had happened to Jose Ivan. Because he had been threatened and because his brother had been murdered after he was deported, Mr. Ponce-Galvan's sister, Maria Ponce, encouraged him to apply for asylum in the U.S.

Maria testified at her brother's trial that she traveled to Mexico in March, 2021 to bring Mr. Ponce-Galvan a copy of Jose Ivan's death certificate. She suggested that they go to the Otay Mesa Port of Entry ("POE") to inquire about seeking asylum. Believing that the U.S. immigration authorities would help her brother, Maria accompanied Mr. Ponce Galvan to the port of entry so that he could present Jose Ivan's death certificate and tell the immigration officers that he feared the same thing would happen to him in Mexico. Rather than allow Mr. Ponce-Galvan to apply for asylum at the Otay Mesa POE, the agents sent him to San Ysidro POE, where he was also turned away. Maria waited for Mr. Ponce-Galvan at the San Ysidro POE with the hope that he would be permitted to enter the United States and apply for asylum. However, consistent with Title 42 policies in effect at the time, when Mr. Ponce-Galvan went to the San Ysidro POE, he was turned away. Ex. C. Disheartened, Maria returned home to Orange Cove, California and Mr. Ponce-Galvan returned to Tijuana.

Unfortunately, Mr. Ponce-Galvan was threatened in Mexico again, this time just a couple of days before his arrest in this case. On July 4 or 5, 2021, he was in the neighborhood where he had been living since March, when he was approached by three masked individuals in a truck. They told him that this was the second time they

were telling him to leave Tijuana and that there, "wouldn't be a third time." They told him to get out of town as soon as possible. Mr. Ponce-Galvan didn't know what to do. He had tried to ask for assistance at the port of entry but had been turned away. He began to panic. In fear for his life, Mr. Ponce-Galvan went home, gathered his things, and said goodbye to Joanna. He then traveled to El Centro where he tried to cross the border with the hope that he would be permitted to apply for asylum or protection from within the United States.

### B. The Court should grant an adjustment for acceptance of responsibility

The Court should adjust download for acceptance of responsibility under §3E1.1 because, at the time of his arrest, Mr. Ponce-Galvan "truthfully admitted the conduct comprising the offense(s) of conviction."[5] Ex. D. He admitted the elements of the offense as part of the statements he made in the field. He told the arresting agent that he "was a citizen of Mexico who does not possess any immigration documentation to enter, be, or remain in the United States legally." *Id.* He further admitted "to entering the United States illegally by crossing over the United States/Mexico IBF." *Id.* Agent Garcia-Guillen further noted that Mr. Ponce-Galvan made a "credible fear claim" and that that Mr. Ponce-Galvan feared "persecution or torture if returned to Mexico." *Id.*

At trial, Mr. Ponce-Galvan did not testify in his own defense, but rather argued that he was not guilty because he had come to the United States so that he could be arrested and apply for asylum.

The Guidelines allow for an individual to be eligible for acceptance of responsibility post trial. *See* §3E1.1, Application Note 2. "In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example,

---

[5] *See* Attached for ROI describing Mr. Ponce-Galvan's arrest

where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or challenge the applicability of a statute to his conduct."). This is what happened in this case. At the time of his arrest, Mr. Ponce-Galvan admitted to the conduct comprising the elements of the offense, but at trial challenged the applicability of the §1326 statute to his conduct. At trial, he did not testify, but argued that he had made a credible fear claim at the time of his arrest and that his intention was to come to the United States so that he could apply for asylum.

For these reasons, the Court should depart two levels for acceptance of responsibility.

### C. The Court should depart downward on the basis of cultural assimilation

U.S.S.G. §2L1.2 allows for a downward departure based on cultural assimilation where (1) the defendant formed cultural ties primarily with the United States from having resided continuously in the United States from childhood; (2) those cultural ties formed the primary motivation for the defendant's illegal reentry or continued presence in the United States, and (c) such a departure is not likely to increase the risk to the public from further crimes of the defendant.

Mr. Ponce-Galvan came to the United States when he was just 12 years old and has lived in this country for the majority of his life. He grew up in California, began working in the agricultural fields in California's Central Valley when he was 12 after having fled violence and tragedy in Mexico. After having lost several family members to violence in Mexico, he felt like the country of his birth offered no hope or future for him. He fled to the United States after being threatened in Mexico because the United States has been his home and his safe haven since he was young.

For these reasons, a two-level downward departure due to his cultural assimilation is warranted.

### D. Time in custody has been more difficult due to the COVID-19 pandemic

The Court should also consider that time in custody has been more difficult for Mr. Ponce-Galvan due to the COVID-19 pandemic. In addition to the restrictions on movement, programming, access to commissary etc. that have made time in custody more unpleasant than ever, Mr. Ponce-Galvan also contracted COVID-19 while in custody at El Centro GEO in late 2021. He was sick for about two weeks and spent that time in a COVID unit. He experienced many of the common symptoms associated with COVID including headache, bone aches, vomiting, and fatigue. He also lost sense of smell and could barely eat for one week.

Unfortunately, although he recovered, he's continued to have fatigue. It's hard for him to exercise, he tires easily, and experiences shortness of breath. Exercising was one of the ways he was able to pass the time in custody and do something healthy for his mind and his body. Life in custody has felt bleaker without regular access to exercise. He's begun to feel anxious, experience panic attacks, and he has trouble sleeping at night. As a result, he is currently taking anti-anxiety medication as well as medicine to help him sleep.

In an effort to redirect his attention in a positive direction, he recently began working in the kitchen at the San Luis Detention Center from 3 am to 10 am. He enjoys this work. It keeps him occupied and quells his anxiety.

//

//

//

//

//

### III.
### **CONCLUSION**

Giving the foregoing, including that Mr. Ponce-Galvan has lived in the United States since he was a boy where he worked in the fields rather than attend school, and was motivated to return to the United States out of fear that he would be murdered in Mexico, this Court should impose the requested sentence of 30 months' custody.

Respectfully submitted,

DATED: May 12, 2022            *s/ Cassandra L. Lopez*
                                Federal Defenders of San Diego, Inc.
                                Attorneys for Mr. Ponce-Galvan